23-1114 from Southern Iowa United States v. Devonte Veasley Mr. Smith, we see that you're appointed under the Criminal Justice Act and the court would like to give you its appreciation for your willingness to accept the appointment. Thank you, Your Honor. You may proceed. Yes, the 922 G3 is an unconstitutional prohibition against what in many circumstances would be considered law-abiding citizens to own and possess firearms for their armed self-defense. And it does so in a way that as, well, I'm sorry, the analysis has completely changed in recent years because of the Supreme Court's case in Broome. Now, this court in C, SEAY, had previously found that 922 G3 was constitutional after Heller. This court did it under what the standards were in Heller, which is, is there a long-standing prohibition that enables that statute to prohibit firearm statutes? Broome changed that analysis. Broome said that there needed to be a two-step analysis. First, does the statute cover conduct that is within the plain text of the Second Amendment? And then secondly, not whether there's a long-standing prohibition, but whether there's a historical analog to the type of prohibition that they are making. So a couple of things have changed dramatically since this court first decided C. First, of course, is Broome, which changed the analysis that the court made, and second, the court relied on a lot of its sister circuits in C, which had all upheld 922 G3. That is changing dramatically and drastically. The Fifth Circuit has already held that 922 G3 is unconstitutional. That case has been filed for a petition for it to search the Supreme Court. I imagine that it will be granted. And then Rahimi, a case that involved prohibitions related to domestic violence orders, has been granted search with the Supreme Court of the United States, and an oral argument is going to be held on that on November 7th. Counsel, do you think, Judge Kolbester, do you think there's anything left to the long-standing prohibition line of cases after Broome? I don't think so. I think that the court has completely asked courts to change their analysis about how we look at the Second Amendment cases, and to see if there's a historical analog. And the historical analog will serve better to bring forth what the founders meant by the Second Amendment than long-standing prohibitions. Can I have you back up? So standard of review here, we asked you a series of, both parties, a series of questions. Are we in plain air land, or are we in de novo review land? And whatever answer you give, tell me why. Yes, absolutely. So a denial of motion to withdraw a guilty plea would be for abuse of discretion in most circumstances. But because this is a denial of motion to dismiss an indictment, I believe that your review is de novo. But isn't the problem that, and I just want to clarify this, isn't the problem that yes, it's jurisdictional, but it wasn't raised when the dismissal of the indictment needed to happen, which is very early on in the case, before a guilty plea, before a trial. And here that did not happen. So does that put us in plain air land? No, I don't think so. Because it still was raised in the district court, and you see, even in C, even in cases like that, when there's a jurisdictional attack on the statute, a facial challenge to the statute, that is still de novo after you, even if it's made after the guilty plea. The difference in C, though, is it actually happened, I think, before the guilty plea. I think C, that the motion to dismiss the indictment might have been untimely in the sense that it came a little later, but I think it at least came before the motion to withdraw the guilty plea. It came earlier in the litigation, and then it was brought up again later. That was my understanding of the procedural history. So does C help you? I think that C does help me, because I think that you have to do the motion to do this indictment as a jurisdictional issue, as a legal question. It's always a legal question. It's always been brought up at the district court level. So always give the district court the opportunity to correct any error. Plain error review in this instance wouldn't serve any purpose of parties bringing up issues as soon as they could potentially bring them. Okay, so let's move on to sort of the next threshold question. Facial versus as-applied challenge. One thing that's clear based on C and other cases is you're in facial challenge land, because your as-applied challenge has essentially been waived with the guilty plea. So if that's true, one of the things, you mentioned the Fifth Circuit, I think, in Daniels. That was an as-applied challenge. And my question for you is, is Salerno, that you have to basically win a facial challenge, you have to show no constitutional applications whatsoever. Does Salerno apply here? I do think so. I think that that gets me into de novo review territory, you know, dismissing the indictment for lack of jurisdiction because it's constitutional. So I think that because I get that standard review, I think it has to be a facial challenge, no circumstances can the statute be constitutional. I think that's fair. So now I have a little bit of an issue because, you know, in terms of the historical analogs, people who were, and I'm using this because this is what the sources use, lunatics, people who are lunatics were not allowed to own a gun if they were dangerous to others. Arguably, maybe not your client, but arguably somebody on PCP or bath salts or any of these drugs that have great hallucinogenic effects could be dangerous to others. And presumably if they're mentally ill or temporarily mentally ill and dangerous to others, they could be dispossessed of firearms at the time of the founding. So doesn't that just completely resolve this case? I don't think so, your honor, because how they, this is not a question of how, of why we have these prohibitions. There's also a question of how we have these prohibitions. So currently how we do our possession of firearms if you have a mental illness is you have to be adjudicated to have that mental illness. So there has to be another step that happens between you having that mental illness and then you actually go into the next step. So we have that protection even in state court cases because the Supreme Court said, well, if you want to adjudicate someone who's mentally ill or you're going to commit them to an institution, there needs to be some showing of dangerousness and there needs to be clear and convincing evidence that they have this. This is why, you know, we don't see prosecutions of people with depression or anxiety getting prosecuted for this. So even if we were talking about people that are in fact dangerous, there's that extra level of protection that we have for mentally ill people, which is that they have actually been through that. There's also a way to restore rights if you have been adjudicated mentally ill in most states. So you can actually be found to be mentally ill and then got committed to an institution, be better and then go back to the courts and say, look, I'm better now. I'm not dangerous. Can I have my firearms rights restored and that they will give them to you? We don't have any of those protections when you're talking about someone that's on PCP or but also anyone could potentially be dangerous and without a statute requiring some showing of them actually being on something that's dangerous and doing so. I think this is still way too overbroad to say that there's no circumstances that they could be found to be. Mr. Smith, I'd like to go back to Heller and Bruin and I have two questions. One is, what's the difference between Heller's longstanding prohibition language and Bruin's historical analog language? And then two, did Bruin purport to overturn or change Heller's standard? So I think that Bruin purported to clarify Heller's standard and in Bruin's opinion, they don't. I mean, they're the same standard in all of those other cases. But I think that how people have interpreted it is different. So long-standing prohibition can just be a law that we've had on the books for a very long time and say, well, that's a long-standing prohibition. When we're talking about historical analogs, we have to actually look at what we had back when the Second Amendment was first formulated and wonder, OK, well, did they have these type of prohibitions at that time, not just whether we've had them on the books for a long time. I know that that Gruen eliminated the means end analysis that some circuits, not the A circuit, but some circuits were doing. But I thought it otherwise purported to essentially just be applying Heller. Yeah, I would agree that that's how it's doing it. I'm saying I think that how courts have interpreted historical. If that's true, then why isn't Say's finding that 922 G3 is the start of longstanding prohibition on the possession of firearms that Heller declared presumptively lawful? Why isn't that binding on this panel? I don't think that it's binding on this panel because it's not going into action with a historical analog is. It's looking at what whether there's been a longstanding prohibition. So it's looking at, well, have we had this law on the books for a long time? See, didn't look at whether at the time the Second Amendment was formulated, whether there were historical analogs to look back to and say, OK, this matches what we're talking about. With that, I think I'm going to reserve the rest of my time for rebuttal and I hand it over to Mr. Call. Well, let me let me just ask one follow up question, which is, you know, I had a little bit of a hard time with that as well, except for I didn't think that I thought that applied to felon status. And here there's no conviction necessarily of possession of drugs. You could just be nailed for being a felon of possession and have no conviction for drugs whatsoever. So is that what I mean, is that one way to distinguish this from from what was said in Heller? I think that that would be because when we talk about longstanding prohibitions, they talk, they make references to felons and the mentally ill. So it is referencing two pretty specific categories that they knew at the time of Heller did have historical analogs. I mean, it does use the broader language law abiding, and I'll get into this with opposing counsel, but that's my thank you for your answer. And with that, I'll yeah, I think I'll turn over to Mr. Call and take any further questions on the rebuttal. Very well, thank you, Mr. Smith. Mr. Call. May it please the court, counsel. Devante Beasley, a drug user, admitted to the possession of a nine millimeter pistol, which he shot at a minor in a West Des Moines parking lot. The minor had been lured to the parking lot at Beasley's direction to sell illegal drugs. Beasley now challenges the crime he pleaded guilty to raising the Second Amendment claim. But as I hope to demonstrate this afternoon, drugs and guns are a dangerous combination. And the Second Amendment has never been understood to prohibit Congress from disarming individuals who are not law abiding, responsible citizens. Counsel, is that always true? You say it's dangerous. And I agree that you heard me ask opposing counsel. There are instances in which it is dangerous. But let's just take the old lady who's on medical marijuana. Right. She's 80 years old. She's on medical marijuana because she has a hip condition. And a bunch of rowdy youths have been have been bothering her in her neighborhood. So she's decided to get a gun to protect herself in the home. The cops show up, they see the gun and they arrest her for being a drug user in possession of a firearm. Is that lady really what's contemplated here? And I understand there's prosecutorial discretion, but there have got to be instances where people are not dangerous and that a Second Amendment challenge would survive as a plot. Well, I think I have two answers to that question. The first answer is we're here on a facial challenge, not an as applied challenge. And I think that makes all the difference in the world for the outcome of this particular case. The second comment is that Congress does have the ability to identify groups that are perceived as as done so in terms of drug users. They can, but they have to have a historical analog. What's the historical analog here? I couldn't find one, which is why which is why I'm asking. Yeah, and to jump forward to the fourth question, the panel asked me to address there are really three historical analogs that we think apply in answering that question. I want to point out that presupposes that unlawful drug users are encompassed within the text of the Second Amendment and this government's position that they are not because they are not law abiding, responsible citizens. But proceeding now directly to the court's question, there are the intoxication laws, laws disarming members of the groups deemed as dangerous and disabilities from possession of firearms by the mentally ill, starting first with the intoxication laws. The cases have discussed some examples out of colonial Virginia and New York, the militia laws, disarmed, and in the Daniels case, and Daniels wasn't, as the court pointed out earlier, was an as applied challenge. But in the course of the discussion, Daniels suggested that the intoxication analogy was a good one, at least for somebody who was actively under the influence of a controlled substance. And as I read, Daniels, a facial challenge would fail. The second category are those who are deemed as dangerous. The state can take away the right to bear arms from the categories of people that deems dangerous. That's now Justice Barrett writing as an Eighth Circuit judge. In the Cantor case, drugs and firearms are, as I indicated, the dangerous combination. They can, a drug user can mishandle firearms. You can use firearms to commit crimes. Violence may occur as part of the drug culture, the drug business. And of course, because of the unlawful nature of drug use and drug possession, there's always the risk of confrontation with law enforcement. So that's my quick answer to, oh, and then the third category is the mentally ill who Heller recognized could be disarmed. And I'd point the court to, and I know it's a pre-Bruin case, but in Yancey, the Seventh Circuit made the observation that habitual drug users like the mentally ill are more likely to have difficulty exercising self-control. This is, and this comes from the common law idea where justices of the peace could lock up what they referred to as lunatics. And again, while this may not be a dead ringer for modern day restrictions, it's certainly a strong enough correlate in the past constitutional muster under Bruin. One point I would make in that regard is that the analysis under Bruin becomes a little bit more nuanced when we're talking about unprecedented social concerns and unlawful drug use wasn't something that was known in the colonial era. So we have to be looking for historical twins, historical analogs, not a perfect match. I'd like to address the other questions. So I counseled real quickly on that point. There is some evidence that that certain, I don't remember exactly what it was, but we've done a little research on this and that opiates were actually present in some form at the time of the founding. And if at the time of the founding, people who were on opiates were not dispossessed of firearms, would that undermine your argument here? I think that would be a legitimate point to weigh, but I think it would have to exist alongside the prohibitions on the mentally ill. It would have to exist alongside the prohibitions on the intoxicated and on balance, I don't think that would be enough to strip the district ways of authority away. I would like to answer the other question, so I don't don't misappoint the government's view is that say, is still good law and binding on the panel? A number of district judges in this circuit have so ruled. The longstanding prohibition does seem to the government to be a reference to the historical analog. I recognize that the discussion and see. Well, it was fairly brief, but it's also consistent with other cases like Banna, which was a 922 G8 case where the court concluded there's a common law tradition permitting restrictions on firearms by non law abiding citizens or people who are not law abiding and responsible. A more recent case called Adams did something similar in addressing an as applied challenge or 922 G1, and it was sort of interesting in Adams. There was a separate concurring opinion that suggested that the means ends analysis would be the way to go, and that's not what the court adopted. So I think the answer to Judge Gruner's question. Bruin purports to be a an application of Heller, and that's what this circuit was doing as well. And while some other circuits may have strayed in the eyes of the Supreme Court, I don't think the 8th Circuit did. And that those cases are all good law. And the say is binding on the panel. Now, let me let me let me argue with you a little bit about Adams. There is a scenario in which what Adams may have said to be consistent with the Second Amendment. The problem is, and you saw this in the in the dispute in Jackson, is that Adams put the burden of proof on the wrong party, even even in the later, even in the later dissent for the denial of the occurrence. I don't think that anyone objected to the fact that Adams put it on the wrong party. So is Adams really the best thing to rely on? Would it place the burden on the challenger rather than the government? It still was looking at the historical analysis and not going through this two step process. And to the extent that I think that's a fair point. But I also think that got cleaned up by Jackson for purposes of the G1 cases. Just very quickly on the standards of review. Say, I think, really controls say says that at least a facial challenge. We're not as applied challenge with a facial challenge survives the guilty plea. And if it survives the guilty plea, it seems to me that he's allowed to raise this claim that has reviewed de novo. I think we all acknowledge that Bruin was decided after the plea was entered in this in this case. So the government is not suggesting that there's some sort of procedural bar or impediment to this Bruin claim being raised. Isn't one problem with say, though, counsel that and I know I'm nitpicking at some of these cases, but this is what we have to do is say doesn't contain a whole lot of analysis. It basically says there's a circuit consensus. It goes. And as opposing counsel pointed out, some of that circuit consensus is now gone. At least the Fifth Circuit case is now in a different place. And so I'm wondering, that's why we asked the question about Citlodine, which is, is that one we can really rely on here? Is it consistent with Bruin? And I'm not sure the answer is yes. Well, I mean, and Citlodine is a little bit different because that looked at the first step and said they're not among the illegal aliens or not among the people for Second Amendment purposes. Drug users are going to be somewhat different. But even if the court goes through the Bruin analysis fresh based on the analogs I mentioned earlier, we think that the conviction should still stand. Again, this is a facial challenge in terms of the Washington State Grange-Solano question. Mr. Smith seems to concede that that burden of showing no set of circumstances rests with him. And as I mentioned earlier, even cases like Daniels, if I take Daniels at its word, would appear to support a conclusion that a facial challenge must fail. Unless there are additional questions... I did want to respond to Mr. Smith's due process argument or his suggestion that some of these prohibitions are preceded by an adjudication of dangerousness. I think analogous to that is the situation where an unlawful user, there must be under this circuit's law, a temporal nexus between the regular drug use and the possession of a firearm, and that must be proven beyond a reasonable doubt to a jury or admitted at a plea hearing. Ultimately, the government thinks it is acceptable to prevent crime by disarming persons who pose a danger to the community, and there seems to be little dispute that Congress viewed drug users as an inherently dangerous class of individuals. I end where I began. Drugs and guns are a dangerous combination. Congress's decision to disarm drug users categorically does not run afoul of the Second Amendment, and for that reason, we believe that the facial challenge to Section 922G3 should be rejected. If there are no further questions, I yield back whatever I have left in the balance of my time. Very well. Hearing no further questions, Mr. Call, thank you. Mr. Smith, you have about three and a half minutes of rebuttal. Thank you, Your Honor. I want to address the first step of the analysis when we're looking at the people, whether the plain text of the amendment covers the conduct described in the statute, right? So, the government's reading this law-abiding requirement into that phrase, the people. The Second Amendment contains no such phrase of law-abiding within it. And, in fact, there are several other amendments to the Constitution that use the phrase, the people, that if we were to add in the phrase law-abiding, it would completely change the meaning of those amendments to the Constitution. It may not be in the Constitution, but it is in the law-abiding in Heller. I think that it's a mistake to read too much into that, because the phrase law-abiding has no limiting principle. And they talk about this law the Fifth Circuit does in Daniel. So, does law-abiding mean that I follow the law every day of their life? I have speeded before, I will admit to this court, and I've gotten a ticket before. Do I now have no rights? Am I not included within that part of the people? And if so, do I have a right to peacefully assemble because I've speeded before? Or do I have the rights to remain secure in my house because I've speeded before? Or I have not recycled before? Or I've littered before? That phrase is one that we want to talk about when we talk about the Second Amendment, because we do want people to not assault other people with their firearms. We want them to be used in self-defense. But to say that the right only belongs to somebody that has never committed a crime whatsoever is, I think, a mistake. That would completely make the amendment meaningless. I'm sorry, Judge Strauss, I believe you're speaking. Yeah. What about the gun—technical problems—what about the gun possessor who, you know, you bring charges against the gun possessor, and you have gun and drug charges, and the defendant is convicted of both of them. Isn't that different? Doesn't that make it more like Jackson, where you sort of have a felony accompanying it as well? I think that, like I said before, how we are stripping these people of their firearm rights is important. When you have a domestic violence protective order, when you have a mental illness adjudication that happens before, they are on notice that they no longer can possess firearm rights unless they are restored. I think you need to have a similar adjudication of possession of a controlled substance or trafficking of a controlled substance before you're going to start prosecuting these people in order for it to fit within the Second Amendment when we're talking about the people. I mean, Bruin says look at the plain text. The plain text says the people. It doesn't say the law-abiding people. That would be adding text to the Second Amendment that I did not believe was intentioned. That's all I wanted to cover, so unless there are any further questions, I will yield my time. Thank you all for inviting us to speak about this, and I've been very sick, so I'm sorry if that came through when I was speaking. All right, well, I'm not hearing any other questions. We appreciate both counsels' appearance and argument, and especially your willingness to do this kind of as an unscheduled or rescheduled virtual argument, so thank you for accommodating the court and cases submitted, and we will decide it in due course.